## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

Katherine Cover,

                Plaintiff,

                                      Civ. No. 15-515 (RHK/SER)

v.                                        **MEMORANDUM OPINION**
                                              **AND ORDER**

J.C. Penney Corporation, Inc.,

                Defendant.

_____

Ian S. Laurie, Laurie & Laurie, PA, St. Louis Park, Minnesota, for Plaintiff.

Evan A. Burkholder, LeClair Ryan, PC, Dearborn, Michigan, Leslie P. Machado, LeClair Ryan, PC, Alexandria, Virginia, Sharon F. Patterson, Sharon Finegan Patterson, Esq., Chicago, Illinois, Thomas J. Conley, Law Office of Thomas J. Conley, Minneapolis, Minnesota, for Defendant.

_____

### INTRODUCTION

      Plaintiff Katherine Cover, who suffers from a physical disability, started working for Defendant J.C. Penney Corporation, Inc. ("JCP") in 2006.  Following an internal reorganization in May 2012, JCP eliminated Cover's position and reassigned her.  Four months later, she was terminated; shortly thereafter, she filed for bankruptcy.  She commenced this action two years later, alleging JCP discriminated against her on account of her disability, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.01 *et seq.*  Presently before the Court is JCP's Motion for Summary Judgment.  For the reasons that follow, its Motion will be granted.

## BACKGROUND

The following facts, though largely undisputed, are recited in the light most favorable to Cover. Cover is a 42-year-old woman who suffered a brain aneurism in 1993, causing a stroke. (Cover Dep. 7–8.)[1] Her entire right side was initially paralyzed, but over time she regained some strength in her right arm and leg. (Id. 13–15.) Currently, she walks with a limp, does not have full function of her right hand, and is limited in how high and for how long she can raise her right arm. (Id.)

In April 2006, Cover began working for JCP in Woodbury, Minnesota, as a Customer Service Associate ("CSA") at the catalog desk.[2] (Id. 18, 27; Pl. Ex. 11.) This position required her to retrieve already-packaged merchandise from a back room (approximately 10 feet away) for customers who had placed orders from a catalog (and later, online) but chose to pick up their items in store. (Cover Dep. 27, 32, 35; see also JCP Ex. 19 at 1.) She would then ring up their purchases on a cash register. (Cover Dep. 32.) Cover occasionally had to stock items on shelves and fold towels but was not

---

[1] The Court notes that both parties submitted exhibits without affidavits or declarations attesting to their authenticity. "To be considered on summary judgment, documents must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence or a deposition that meets the requirements of [Federal Rule of Civil Procedure 56(c)]. Documents which do not meet those requirements cannot be considered." Stuart v. Gen. Motors Corp., 217 F.3d 621, 635 n.20 (8th Cir. 2000) (internal citation omitted). Hence, there is no foundation for the admissibility of most of the exhibits submitted in connection with this Motion and the Court could deny it on this basis alone. But, because the documents submitted by Cover are, for the most part, the same as those filed by JCP and no objection by either party has been raised, the Court perceives no prejudice in considering the documents notwithstanding this deficiency.

[2] Although Cover's job title changed several times between 2006 and 2012, her job responsibilities at the catalog desk remained the same. (See Pl. Ex. 11; Cover. Dep. 27–28.)

required to participate in "zoning."[3]  (Id. 30–32.)  Cover was regarded as a "good employee" who performed the requirements of her position satisfactorily, and had no performance issues.  (Brooks Dep. 26, 34.)

**Cover's position is eliminated**

In May 2012, JCP reorganized its stores by restructuring some positions and eliminating others (Brooks Dep. 27–28; JCP Ex. 19 at 1); Cover's position and all other catalog department jobs were eliminated company-wide (Cover Dep. 28; Kalkhoff Decl. ¶ 2).  The Woodbury store manager, Mark Brooks, offered to reassign Cover to a new position as a Support Specialist ("SS"); she accepted.  (Brooks Dep. 24, 28, 30–33, 37; see also JCP Ex. 3.)  All of Cover's coworkers whose catalog positions had been eliminated were likewise offered SS positions.  (Kalkhoff Decl. ¶ 2; Kalkhoff Dep. 14–15.)  The responsibilities of a SS include:

> walk the floor and stock room areas and/or works appropriate reports to identify replenishment opportunities; brings out merchandise to fill the floor []; ensure products are displayed to core standards . . . delivers and unloads the trucks; prepares the merchandise and places merchandise on fixtures or to back stock . . . delivers pricing and signing activities by ticketing for clearance and other price changes . . . retrieves merchandise from stock room and delivers items to customers for checkout . . . moves/stages/sizes fixtures, place graphics and assists with assembling/installing additional visual elements.

(Kalkhoff Decl. ¶ 3, Ex. A; Pl. Ex. 10.)

---

[3] Zoning involves clearing out fitting rooms; folding, re-shelving, and re-stocking clothes and other items; and other clean-up activities, all at the end of the day, after the store closed for the night.  (Cover Dep. 32–33; Brooks Dep. 74.)  Zoning activities were also performed throughout the day, but to a lesser degree.  (Brooks Dep. 68.)

In her new position, Cover struggled.  (See JCP Ex. 19 at 2.)  She had to walk more frequently and farther to retrieve online orders for customers: from the front of the store to the same back room where she used to work.[4]  (Kalkhoff Dep. 12, 19–20; Cover Dep. 34–36; see also JCP Ex. 19 at 2.)  It was also difficult for her to carry the larger items to the front of the store.  (Cover Dep. 47, 71.)  She also had to perform zoning duties, which was difficult to do with only one functional arm.  (Cover Dep. 33, 69–70; JCP Ex. 19 at 2.)

Due to these problems, Cover's supervisor, Alicia Kalkhoff, unofficially moved Cover to a CSA position.  (Kalkhoff Dep. 9, 16; Kalkhoff Decl. ¶¶ 3–6.)  The job duties of a CSA include greeting customers; walking around departments assisting customers in selecting clothes; carrying clothing to and from the dressing rooms; hanging up clothes, folding them, and returning them to their proper place; *ringing up and bagging the purchases*; cleaning the dressing rooms; and zoning.  (Kalkhoff Decl. ¶¶ 5–6; Kalkhoff Dep. 15–16.)

While it is unclear when she moved into the CSA position, the record reveals Cover performed cashiering duties exclusively for just one day—July 22, 2012.[5]  (Cover Dep. 37, 41; JCP Ex. 22; see also Compl. ¶ 10.)  Yet, Cover acknowledges this task, too, was a challenge; she had difficulty placing merchandise in bags with only one functional

---

[4] JCP and its employees refer to this task as "running" or "being a runner."

[5] JCP does not have a position that allows a person to cashier exclusively on a regular basis. (Kalkhoff Decl. ¶¶ 4–7.)

hand and either required another employee to assist her or the customers' assistance to bag their own merchandise.  (Cover Dep. 41–42.)

**Cover requests an accommodation**

The following day, July 23, 2012, Cover requested an accommodation by leaving a doctor's note, dated June 11, 2012, on Brooks's desk.  (Pl. Ex. 5; JCP Ex. 19 at 2; Pl. Ex. 6 at 51; Brooks Dep. 36–37, 64.)  The note was the product of a visit Cover had a month prior with her neurologist, Dr. Charles Horowitz.  (See Cover Dep. 39–41.)  It stated in relevant part:

> Because of her limitations as a result of the subarachnoid hemorrhage, she should not be lifting anything over 25 pounds.  She should also have limited or restricted amounts of walking because of balance issues. Bagging clothes is difficult for her because of the paralysis of her right arm. Closing shifts are also difficult for her because of the cleaning and folding of large amounts of clothing.

(Pl. Ex. 5.)

Brooks testified that, after receiving this note, he had a conversation with Cover. (Brooks Dep. 37.)  He asked which job Cover wanted or thought she could handle at the store.  (Id.; JCP Ex. 19 at 2.)  Cover's response is disputed.  Brooks testified in his deposition that Cover responded, "No.  I'm supposed to say what positions do you have available for me?"  (Brooks Dep. 37; see also id. 45.)  He felt uncomfortable with this response because it was as if someone had told her what to say.  (Id. 37, 45.)  Cover, on the other hand, told an EEOC investigator in October 2012 that she said she did not know what other jobs were available that she could perform, but that she could do any job that would fulfill her doctor's accommodations.  (JCP Ex. 19 at 2.)  Regardless, the parties

agree on the remainder of the conversation: Brooks told Cover he was going to contact

JCP's Human Resources ("HR") office in Texas to determine next steps and she should

go home for the rest of the day with pay.  (Id. 37, 45, 55.)  Brooks also told her she was

on leave until he could determine what jobs matched the accommodations she sought;

Cover did not work another day at JCP.  (See id. 37–38, 55–56, 58, 68–70.)

Brooks forwarded Cover's note to Crystal Hodges in HR.  (Pl. Ex. 6 at 51; Brooks

Dep. 15–17, 24, 36.)  Hodges directed Brooks to contact Powerline Absence

Management Center ("Powerline").[6]  (Pl. Ex. 6 at 51.)  On July 30, 2012, a Powerline

employee, Rochelle Owens, sent Cover a letter and an accommodation form for her

doctor to complete.  (See Pl. Exs. 7, 8.)  The next day, Owens called Cover to discuss her

medical limitations.  (Pl. Ex. 6 at 24.)  Owens's notes from that call state: "This associate

said then with the new changes she is not able to perform the task of being

cashier/catalog runner as it requires bagging and a lot of grasping and gripping which she

is not able to do."  (Id.)

Powerline received the completed accommodation form from Dr. Horowitz four

weeks later, on August 27, 2012.  (Pl. Ex. 8.)  He stated Cover was "substantially

limited" in many life activities, including walking, standing, speaking, sitting, and

"work[ing] – difficulty in separating plastic bags, lifting, bending, twisting, and

carrying."  (Id. at 5.)  He explained Cover would benefit specifically from a plastic bag

separation device, no zoning because it involves bending, a lifting restriction of not more

---

[6] Powerline is a third-party administrator that provides disability and absence management
services for JCP.  (Kalkhoff Dep. 18; Brooks Dep. 50.)

than 25 pounds, and a cart to move items.  (Id.)  He repeated Cover was having trouble

performing the functions of "bagging, carrying, [and] sorting" and made three specific

accommodation requests:

> 1. no lifting over 25 pounds, use a cart for carrying items;
> 2. a plastic bag separator device; and
> 3. no zoning.

 (Id. at 6.)

On August 29, 2012, Owens informed Brooks of the three requests and asked if he

could accommodate these restrictions.  (Pl. Ex. 6 at 40–41, 47, 51–54.)  After a phone

call the next day between Owens and Brooks (id. at 17–18), it was determined there were

no available positions at JCP that would fit Cover's restrictions.[7]  (Id. at 17 ("[Brooks]

said there is nothing he has for [Cover] today as all their jobs are bagging and zoning in

which her [restrictions] state she cannot [do] that type of work."); see also id. 43, 47, 52;

Brooks Dep. 67–70.)

**Cover is fired**

On September 11, 2012, Owens sent Cover a letter stating there were no

permanent accommodations available.  (Pl. Ex. 4.)  On September 27, 2012, Brooks

called Cover to tell her she was terminated from her employment with JCP because there

was no job available at JCP in which her permanent restrictions could reasonably be

accommodated.  (Brooks Dep. 26, 56, 58–59.)

---

[7] At the time, there were only two available positions at the store: the CSA position (requiring extensive zoning, bending, and twisting) and the SS position (requiring extensive walking, moving, staging, and restocking).  (Kalkhoff Decl. ¶¶ 3–5; Cover Dep. 72–73; see also JCP Ex. 18 at Interrog. No. 5.)

One month later, Cover filed a charge of disability discrimination with the Equal

Employment Opportunity Commission ("EEOC"), stating that "[her] reasonable

accommodation request was denied and [she] was discharged."[8]  (JCP Ex. 11 at 2.)  Her

given reason for her termination was that "[n]o accommodations [were] available."  (Id.)

**Cover files for bankruptcy**

In March 2013—while her EEOC charge was still pending—Cover and her

husband filed a voluntary Petition for Chapter 7 bankruptcy.  (Pl. Ex. 16; JCP Ex. 13;

Cover Dep. 25–26.)  She contends her wrongful termination contributed to her need to

file for bankruptcy.  (Mem. in Opp'n at 11.)  Her Petition stated, among other things, that

she had not been a party to any suit or administrative proceeding in the year preceding

her Petition and had no contingent or unliquidated claims of any nature.  (JCP Ex. 13

at 13, 31.)  Cover signed a Statement of Financial Affairs in which she declared under

penalty of perjury that she had read the bankruptcy Petition and its contents were true and

accurate.[9]  (JCP Ex. 13 at 29, 31, 37.)  Cover did not list her discrimination charge as an

asset.  (See Cover Dep. 64–65.)

---

[8] Cover's charge was cross-filed with the Minnesota Department of Human Rights ("MDHR").
(JCP Ex. 11 at 2.)

[9] Additionally, a document styled as "Notice of Responsibilities Order," which was filed with the
Petition and signed by Cover, provides:

> Before the case is filed, the chapter 7 debtor shall . . . [p]rior to and throughout the
> case, timely provide [her] attorney with full and accurate financial and other
> information and documentation [her] attorney requests, INCLUDING BUT NOT
> LIMITED TO:

Nonetheless, Cover attended a creditors' meeting[10] on March 6, 2013, where she orally disclosed her pending EEOC charge against JCP, alleging it "eliminated [her] position" and discriminated against her.  (Pl. Ex. 14 at 1:55 (transcribed at Mem. in Opp'n at 12–14 and Reply at 11–13).)  In response to the trustee's questions, Cover testified she had only been sent a letter from the EEOC informing her that the investigation into her claim would take one year.  (Id.)  The trustee requested a copy of this letter to determine if there was going to be any recovery from the claim because, if there was, she would have to be notified.  (Id.)

In May 2013, the trustee sent a letter to EEOC Investigator Charlotte Czarnecki, and Cover's bankruptcy attorney, L. John Laver, inquiring about the status of the charge.[11]  The trustee informed Czarnecki that "the debtor scheduled an interest in a wrongful termination claim against [JCP]."  (JCP Ex. 16 at 3.)  The trustee also advised that the bankruptcy estate may have an interest in any recovery Cover may receive from the claim, that any settlement must be approved by the trustee, and requested to be provided with an estimate of Cover's potential recovery.  (Id.)  Despite receiving no response, the bankruptcy court granted Cover and her husband a complete discharge of

---

14. Information and documents relating to any lawsuits in which the debtor is involved before or during the case or claims the debtor has or may have against third parties.

(JCP Ex. 15 at 3.)

[10] This meeting was held in accordance with 11 U.S.C. § 341(a).  In a Chapter 7 proceeding, a debtor appears in front of an appointed trustee, under oath, to discuss her petition.

[11] Cover has been represented by numerous attorneys throughout her bankruptcy process, the filing of her EEOC charge and subsequent investigation, and the present action.

their debts on June 10, 2013, a figure totaling $277,587.00.  (Pl. Ex. 16 at 4.)  The bankruptcy estate remained open, however, for administrative purposes.

The trustee again reached out in October 2013 and May 2014 to inquire about the status of the EEOC charge.  (Id. at 1; JCP Ex. 16 at 4–5.)  The trustee finally received replies in May.  Laver responded, saying "I do not believe that [the EEOC] has done anything with [the claim].  I do not believe that this case is going to go anywhere."  (Id. at 5.)  Czarnecki separately answered: "This claim is still being investigated.  There is no indication that there will be a monetary settlement. . . . I expect [the matter will be completed] by the end of this summer.  [T]he charge could be dismissed without settlement."[12]  (Id. at 7–8.)

On September 29, 2014, the trustee terminated the bankruptcy estate.  (Pl. Ex. 16 at 4.)  The trustee noted that, having made a diligent inquiry into the financial affairs of the debtors and the location of the estate's property, she found no property available for distribution to creditors.  (Id.)

After receiving her Notice of Dismissal and Right to Sue letter from the EEOC in November 2014, (JCP Ex. 12), Cover commenced this action in the Dakota County, Minnesota District Court on January 26, 2015, alleging two counts of disability discrimination and failure to accommodate in violation of the ADA and the MHRA.  (See Doc. No. 3.)  JCP timely removed the action to this Court and, after completing

---

[12] As noted by JCP, and undisputed by Cover, to date, no one has contacted the trustee to disclose the filing of the present action or to reopen the bankruptcy proceeding to amend the petition.

discovery, now moves for summary judgment.  The Motion has been fully briefed and is ripe for disposition.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557 U.S. 557, 586 (2009).  The moving party bears the burden of showing that the material facts in the case are undisputed.  Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*)[13]; Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009).  The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party.  Beard v. Banks, 548 U.S. 521, 529–30 (2006); Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009).  The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(c)(1)(A); Wood v. SatCom Mktg., LLC, 705 F.3d 823, 828 (8th Cir. 2013).

## ANALYSIS

JCP raises two arguments why this action should be dismissed.  First, it argues Cover's claims are barred by judicial estoppel because she failed to formally disclose, or

---

[13] Several Eighth Circuit cases cited herein have a "red flag" on Westlaw as a result of Torgerson, which abrogated a litany of decisions suggesting summary judgment should be sparingly granted in discrimination cases.  Because this Court has cited these cases for different legal principles that remain good law, it has not indicated such abrogation.

amend her bankruptcy Petition to include, her EEOC charge or, later, this lawsuit against

JCP.  Second, it argues Cover is not a "qualified individual" under the ADA and the

MHRA because she was unable to perform the essential job functions of any available

position at JCP, with or without reasonable accommodation.  The Court will address each

argument in turn.

## I.     Judicial estoppel

Judicial estoppel is an "equitable doctrine" that "prevents a party from asserting a

claim in a legal proceeding that is inconsistent with a claim taken by that party in a

previous proceeding."  Van Horn v. Martin, 812 F.3d 1180, 1182 (8th Cir. 2016) (citing

Stallings v. Hussmann Corp., 447 F.3d 1041, 1047 (8th Cir. 2006)).  In deciding whether

to apply the doctrine, courts consider three factors: (1) whether a party's later position is

clearly inconsistent with its previous position; (2) whether the party succeeded in

persuading the first court to accept its position; and (3) whether the party seeking to

assert an inconsistent position would derive an unfair advantage if not estopped.  E.g.,

Jones v. Bob Evan Farms, 811 F.3d 1030, 1033 (8th Cir. 2016); Van Horn, 812 F.3d

at 1182.

### 1.     First Factor

Cover does not dispute that she took an inconsistent position in her *Petition*.

Instead, she contends her *oral notice* to the trustee at the creditors' meeting was sufficient

disclosure.  (Mem. in Opp'n at 27–29 ("Plaintiff . . . did not take an inconsistent position

at her *bankruptcy proceeding*.") (emphases added).)  However, Cover cites no legal

authority to support her argument.  Rather, the weight of authority holds oral disclosures

to the trustee are insufficient to escape the imposition of judicial estoppel.  See, e.g.,

Guay v. Burack, 677 F.3d 10, 19–20 (1st Cir. 2012); Ibok v. SAIC-Sector Inc., 470

F. App'x 27, 29 (2d Cir. 2012); Lewis v. Weyerhaeuser Co., 141 F. App'x 420, 424–27

(6th Cir. 2005); Barger v. City of Cartersville, Ga., 348 F.3d 1289, 1295 (11th Cir. 2003);

Hamilton v. State Farm Fire & Cas. Co., 270 F.3d 778, 784 (9th Cir. 2001).

Furthermore, there is no evidence in the record that Cover or any of her attorneys

amended the Petition to formally disclose the EEOC charge or the present lawsuit.

Debtors have a continuing, affirmative duty to disclose all assets and potential causes of

action under 11 U.S.C. § 521(1).  Formal disclosure and amendment of a petition is

important because when a creditor seeks to obtain a copy of the debtor's assets, it is only

given a copy of the petition and the schedules attached to it.  See 11 U.S.C. § 521(e)(1)

(upon request, court only tenders to creditors the petition, schedules, and statement of

financial affairs).  The only locations where Cover disclosed her EEOC claim—the audio

file of the creditors' meeting and communications between the trustee and her counsel—

are unavailable to creditors.  Hence, despite her later, oral disclosure, Cover failed to

adequately amend her Petition, and she also failed to keep the trustee apprised of the

status of her EEOC charge, or the existence of this action.  In the Court's view, Cover's

positions are clearly inconsistent.

Nonetheless, Cover argues any inconsistent position she took in her Petition was

asserted in good faith, and forecloses the application of judicial estoppel.  This defense

applies "[i]f a debtor does not have knowledge of [the] undisclosed claims or lacks a

motive to conceal them."  Van Horn, 812 F.3d at 1183; see also Bob Evans, 811 F.3d

at 1034; E.E.O.C. v. CRST Van Expedited, Inc., 679 F.3d 657, 677–80 (8th Cir. 2012).

There is no dispute Cover knew about her claim.  She not only filed a charge with the

EEOC, but she also completed an EEOC intake questionnaire and was interviewed by

EEOC Investigator Julie Hammer on October 24, 2012—more than four months before

she filed the Petition.  (See JCP Exs. 10, 11, 19.)

      Nor is there any dispute as to whether she had a motive to represent her charge as

being inconsequential in nature.  The rationale is simple—by not disclosing her EEOC

claim against JCP, the bankruptcy estate could discharge her creditors and she could reap

the (potential) financial rewards of the discrimination lawsuit.  For this reason, in cases

such as this, motive is essentially assumed.  See Eastman v. Union Pac. R.R. Co., 493

F.3d 1151, 1159 (10th Cir. 2007) ("The doctrine of judicial estoppel serves to offset such

motive[s and induce] debtors to be completely truthful in their bankruptcy disclosures.");

see also Stallings, 447 F.3d at 1048; CRST Van Expedited, 679 F.3d at 680.

      Cover retorts there is no record of intent or malice on her part.  (Mem. in Opp'n

at 28.)  While a finding of intent or malice is not required, there are two facts in the

record which undermine Cover's argument: (1) she never attempted to amend her Petition

to add the charge or reopen the bankruptcy case to include the lawsuit.  As such, the

record in the bankruptcy file inaccurately represented her assets at the time her discharge

was granted.  This was her second time filing for bankruptcy (see JCP Ex. 14)—she was

familiar with the process; and (2) Cover and her counsel failed to apprise the trustee of

the status and value of her claim.  See Barger, 348 F.3d at 1296 (because plaintiff

"deceived the trustee" in not telling him about the monetary value of the lawsuit, plaintiff

was judicially estopped).  Hence, the trustee had no information when she discharged the debt as to the likely value of the claim or the existence of a future, related lawsuit requesting monetary damages.  Cf. Eubanks v. CBSK Fin. Group, Inc., 385 F.3d 894, 898 (6th Cir. 2004) (reversing district court's application of judicial estoppel because plaintiff's counsel was in repeated contact with trustee about a potential civil cause of action prior to the discharge).

Finally, Cover briefly asserts she relied on her counsel's advice when she represented she had no administrative claim or potential lawsuit in the Petition.  As Cover attested: "I filed for Chapter 7 bankruptcy in 2013.  At the time, I had filed an EEOC charge.  I had an attorney, John Laver, assist me with this petition.  I informed [Laver] of my pending EEOC charge."  (Cover Aff. ¶ 5; see also Cover Dep. at 24, 26.)  This argument is unavailing.  Reliance on legal advice does not constitute a good faith mistake for purposes of judicial estoppel.  See, e.g., Eastman, 493 F.3d at 1159; Cannon-Stokes v. Potter, 453 F.3d 446, 449 (7th Cir. 2006) ("[B]ad legal advice does not relieve the client of the consequences of her own acts."); Jethroe v. Omnova Solutions, Inc., 412 F.3d 598, 601 (5th Cir. 2005).  Consequently, the first factor is satisfied.

2.      *Second Factor*

To establish the second factor, a court must have accepted a party's prior position. Bob Evans, 811 F.3d at 1033.  Bob Evans held a bankruptcy court's discharge of debts is sufficient acceptance of a debtor's initial position to provide a basis for judicial estoppel. Id.; see also Van Horn, 812 F.3d at 1183.  Here, when the trustee discharged Cover's debts on June 10, 2013, the trustee had adopted the position that Cover had no assets, and

hence that the discrimination claim did not exist and was valueless.  Accordingly, the second factor is met.

### 3.      *Third Factor*

Cover does not dispute that she obtained an unfair advantage.  (Mem. in Opp'n at 27–29.)  By filing this action and not disclosing it on the schedules of assets, Cover's potential damages arising from this lawsuit would go directly to her and not to her creditors.  Her creditors did not know she had a pending EEOC claim and they do not know she is currently pursuing litigation against JCP in the hopes of obtaining monetary relief.  (See Compl. at 6.)  They have been deprived of the opportunity to receive payments from any proceeds she might have recovered.  Hence, the third factor is satisfied.

Finding that all three factors are satisfied and that Cover's actions were not due to a good-faith mistake, she is judicially estopped from asserting her claims in this lawsuit.

## II.      Merits

The ADA and the MHRA prohibit discrimination against qualified individuals on the basis of disability.[14]  42 U.S.C. § 12112(a); Minn. Stat. § 363A.08.[15]  Absent direct proof of discrimination, the Court analyzes a claim under these statutes using the familiar McDonnell Douglas burden-shifting framework.  Otto v. City of Victoria, 685 F.3d 755,

---

[14] Although mentioned in the Complaint and addressed in JCP's Memorandum, Cover is not alleging a hostile-work-environment claim.  (Mem. in Opp'n at 26.)

[15] For all purposes relevant to this Order, claims under these statutes are analyzed in the same fashion; accordingly, the Court's analysis encompasses Cover's claims under both.  See Somers v. City of Minneapolis, 245 F.3d 782, 788 (8th Cir. 2001).

758 (8th Cir. 2012).   Under this framework, a plaintiff must first establish a prima facie

case of discrimination.   E.g., Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1134–35

(8th Cir. 1999).   To do so, Cover must submit sufficient evidence to create a genuine

issue as to whether she (1) was disabled; (2) was qualified to perform the essential

functions of the job, with or without reasonable accommodation; and (3) suffered an

adverse employment action due to her disability.   Id.   Only the second element is in

dispute here.

An individual is qualified if she can perform the essential job functions, with or

without reasonable accommodation.   Rehrs v. Iams Co., 486 F.3d 353, 356 (8th Cir.

2007); 42 U.S.C. § 12111(8)–(9).   "Essential functions of the job are fundamental job

duties, and the employer's judgment in this regard is considered highly probative."

Duello v. Buchanan Cnty. Bd. of Supervisors, 628 F.3d 968, 972 (8th Cir. 2010) (internal

quotations omitted).

JCP contends that, after it reassigned her, Cover was unable to perform the

essential functions of either available position (SS or CSA) with or without an

accommodation.   Cover, however, repeatedly asserts she was qualified to perform

exclusively as a cashier with a reasonable accommodation of a plastic bag separator

device.  (Mem. in Opp'n at 15, 19–21.)

But, Cover overlooks one fatal flaw in her argument.   Even if JCP had provided

her a plastic bag separator device,[16] she was still unable to perform any other essential

---

[16] Cover insists this device would have enabled her to cashier on her own, but she fails to submit
any evidence supporting this assertion.   "The employee [] carries the burden of showing that a

function of the SS or CSA position—and she does not dispute these positions had other

essential, non-cashiering functions.  Zoning was one such task; but, because it required

repetitive bending, twisting, and folding, Dr. Horowitz forbade Cover from performing

this task.  (Pl. Ex. 8 at 5); Otto, 685 F.3d at 758 (employer is not required to permit

employee to perform a job function the employee's doctor has forbidden).  Being a

runner was another essential function.  Yet, she could not walk well or carry large

items.[17]  (JCP Ex. 22.)

Essentially, Cover wants JCP to create a new position just for her: cashier with a

bag separator device.[18]  But, an employer is not required to create a new position, or

---

[17] particular accommodation rejected by the employer would have made the employee qualified to perform the essential functions of the job."  Fjellestad v. Pizza Hut of Am., Inc., 188 F.3d 944, 954 (8th Cir. 1999); accord Stafne v. Unicare Homes, 266 F.3d 771, 774 (8th Cir. 2001).  The only evidence in the record regarding this device is Brooks's blind estimation that it costs around $100.  (Brooks Dep. 60–61.)  Yet, he also testified in his deposition that JCP did not have "the resources in the store to provide a bag separator."  (Id. 60.)  Hence, there being no evidence proffered that a plastic bag separator device would have allowed her to cashier, Cover has failed to meet her burden.

[17] It is important to note that, through the interactive process, the accommodations and limitations Cover herself requested were much broader than those on the form completed by Dr. Horowitz.  (See Pl. Ex. 5 (limited amounts of walking, bagging is difficult, closing shifts are difficult); id. Ex. 6 at 24 (Cover said she is "not able to perform task of being cashier/catalog runner as it requires bagging and a lot of grasping and gripping.").)  Between Cover's and Dr. Horowitz's requests, Brooks determined Cover could perform none of the essential functions of either open position.  (Brooks Dep. 59–62, 69–76; Pl. Ex. 6 at 17.)

[18] Cover argues JCP failed to engage in the interactive process by not acting in good faith, which is a question for the jury.  (Mem. in Opp'n at 22.)  She focuses on JCP's use of a third party to facilitate the process and how this caused poor communication between the parties.  Yet, the record is replete with evidence of discussions between Brooks, Powerline, Cover, and Dr. Horowitz.  (See Pl. Ex. 6.)  In fact, when Brooks asked Cover about the request when it was initially made in July, it was Cover who did not engage in the discussion about her needs and limits.  (See JCP Ex. 19 at 2; Brooks Dep. 37, 45; 29 C.F.R. § 1630.2 (purpose of interactive process is for employer to find out precise limitations and potential reasonable

transform a temporary position (like cashiering) into a permanent position, as an accommodation.  Fjellestad v. Pizza Hut of Am., Inc., 188 F.3d 944, 950 (8th Cir. 1999); see also Dropinski v. Douglas Cnty., Neb., 298 F.3d 704, 710 (8th Cir. 2002) ("An employer need not reallocate or eliminate the essential functions of a job to accommodate a disabled employee.").  Because Cover could not perform the essential functions of the available positions with or without an accommodation, she is not a qualified individual under the ADA or the MHRA.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that JCP's Motion for Summary Judgment (Doc. No. 25) is **GRANTED** and Cover's Complaint (Doc. No. 3) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.


Dated: May 20, 2016                              s/Richard H. Kyle
                                                 RICHARD H. KYLE
                                                 United States District Judge

---

accommodations).)  JCP had to rely on Dr. Horowitz and Owens to determine her limitations; Cover cannot now use her own silence against the company.  See Fjellestad, 188 F.3d at 952–53.